**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TENNESSEE**
**WESTERN DIVISION**

─────────────────────────────────────────────

TERRY MONTGOMERY,                  )
                                   )
     Plaintiff,                    )
                                   )
v.                                 )        No. 23-cv-1210-TMP
                                   )
MARTIN O'MALLEY,                   )
COMMISSIONER OF SOCIAL             )
SECURITY ADMINISTRATION,           )
                                   )
     Defendant.                    )

─────────────────────────────────────────────

**ORDER AFFIRMING THE COMMISSIONER'S DECISION**

─────────────────────────────────────────────

On October 6, 2023, Terry Montgomery filed a complaint seeking judicial review of a social security decision.[1] (ECF No. 1.) Montgomery seeks to appeal a final decision of the Commissioner of Social Security ("Commissioner") denying his application for Title II and Title XVI disability benefits. (ECF No. 23 at PageID 3827.) For the following reasons, the decision of the Commissioner is AFFIRMED.

**I. BACKGROUND**

On December 20 and 21, 2018, Montgomery filed applications for a period of disability and disability insurance benefits

─────────────────────

[1]After the parties consented to the jurisdiction of a United States magistrate judge on November 27, 2023, this case was referred to the undersigned to conduct all proceedings and order the entry of a final judgment in accordance with 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73. (ECF No. 11.)

under Title II of the Social Security Act ("Act"), 42 U.S.C. §§ 404-434, and a Title XVI application for supplemental security income (ECF No. 18-1 at PageID 2197-208.) He alleges disability since September 1, 2017, but due to a prior decision dated July 23, 2018, the applicable timeline cannot precede the July 23, 2018 date. (<u>Id.</u> at PageID 3218.)[2] Montgomery's applications were denied on April 29, 2019. (<u>Id.</u> at PageID 2119.) He requested a hearing before an Administrative Law Judge ("ALJ") on December 4, 2019. (<u>Id.</u> at PageID 2140.) The hearing was conducted before ALJ Scott Shimer on April 9, 2020. (<u>Id.</u> at PageID 1955.) Judge Shimer issued a written decision denying benefits on May 12, 2020. (<u>Id.</u> at PageID 1948-49.) Montgomery filed a request for review of the decision with the Appeals Council on June 26, 2020. (<u>Id.</u> at PageID 2193.) The Council denied his appeal on December 28, 2020. (<u>Id.</u> at PageID 1180.) Montgomery then appealed to the U.S. District Court for the Western District of Tennessee, which, on February 16, 2022, reversed and remanded the decision, granting him a new hearing. (<u>Id.</u> at PageID 3273-75.) A new hearing was held before ALJ Shimer on December 13,

---

[2]Montgomery was previously denied Social Security disability benefits in a decision dated July 23, 2018. (ECF No. 18-1 at PageID 2005-21.) "ALJ Heath's prior unfavorable decision remains final, binding and not subject to further review, and the undersigned is therefore prohibited from reconsidering any of the evidence in the record prior to July 23, 2018 as a matter of law pursuant to res judicata principles." (<u>Id.</u> at PageID 3218 (citing 20 C.F.R. § 404.957(c)(1)).)

2022. (Id. at PageID 3217.) On February 1, 2023, ALJ Shimer again concluded that Montgomery was not entitled to social security disability benefits. (Id. at PageID 3217-37.) The Appeals Council considered Montgomery's subsequent appeal but ultimately declined to assume jurisdiction of the case on August 22, 2023. (Id. at PageID 3207.) Montgomery then appealed the matter to this court, where the February 1, 2023 ALJ decision represents the final decision of the commissioner.

Montgomery alleged that he was disabled from seizures, back problems, pain in his legs and ankles, sleep apnea, anxiety, and arthritis. (Id. at PageID 2219.) After considering the record and the testimony given at the hearing, the ALJ used the five-step analysis to conclude that Montgomery was not disabled for purposes of receiving Title II and Title XVI benefits. (Id. at 3219—37.) At the first step, the ALJ concluded that Montgomery had not engaged in gainful employment since July 24, 2018. (Id. at PageID 3221.) At the second step, the ALJ found that Montgomery had the following severe impairments: seizure/conversion disorder, bilateral chronic serous otitis media and eustachian tube disfunction, asthma, cervical spine radiculopathy, lumbar spine spondylosis, obesity, generalized anxiety and depression disorders. (Id. (citing 20 C.F.R. § 404.1520(c) and 416.920(c)). At the third step, the ALJ found that Montgomery does not have an impairment or combination of

impairments that meets or medically equals the severity of one
of the listed impairments in 20 C.F.R. Part 404, Subpart P,
Appendix 1. (Id.) Accordingly, the ALJ had to next determine
whether Montgomery retained the residual functional capacity
("RFC") to perform past relevant work or could adjust to other
work. The ALJ found that Montgomery:

> has the residual functional capacity to perform light
> work as defined in 20 CFR 404.1567(b) and 416.967(b),
> with the following limitations: He can only be
> exposed to moderate or less noise (not loud or very
> loud). He can occasionally reach overhead with his
> bilateral upper extremities. He can frequently
> balance, kneel and crouch. He cannot stoop, crawl or
> climb ladders, ropes or scaffolds. He cannot be
> exposed to concentrated temperature extremes or
> pulmonary irritants such as dusts, fumes, odors, gases
> and poor ventilation. He cannot work at unprotected
> heights, around unguarded moving machinery or drive.
> He can understand, remember and perform simple and
> low-level detailed instructions and tasks. He can
> adapt to occasional workplace changes.

(Id. at PageID 3224.) Pursuant to 20 C.F.R. § 404.1567(b),
light work "involves lifting no more than 20 pounds at a time
with frequent lifting or carrying of objects weighing up to 10
pounds." Additionally, light work includes jobs "requir[ing] a
good deal of walking or standing, or [that] involve[] sitting
most of the time with some pushing and pulling of arm or leg
controls." 20 C.F.R. § 404.1567(b).

   In reaching the RFC determination, the ALJ discussed
Montgomery's allegations and the medical evidence in the record.
The ALJ summarized Montgomery's allegations as follows:

- 4 -

[Montgomery] alleges he has suffered from disabling seizure, ear, asthma, neck, back, leg, knee, anxiety and depression problems since July 24, 2018, the day after the date of his last unfavorable decision. [Montgomery] alleges he has suffered from frequent catatonic seizures, convulsions and postictal confusion, fatigue and tremors because of his seizure problem. [Montgomery] alleges he has suffered from decreased hearing and communication problems because of his ear problem. [Montgomery] alleges he has suffered from frequent wheezing, coughing, chest pain, shortness of breath and additional fatigue because of his asthma problem. [Montgomery] alleges he has suffered from constant chronic tenderness, muscle spasms, stiffness and pain in his neck, shoulders, back, legs and knees since then because of his problems in those areas. [Montgomery] alleges he has suffered from excessive nervousness, irritability, mood swings, sadness, low energy and motivation levels and the loss of interest in the pleasures and enjoyment of life because of his anxiety and depression problems. [Montgomery] alleges his physical problems have seriously limited his ability to reach, lift, sit, stand, walk, bend, stoop, squat, kneel and climb. [Montgomery] alleges his mental problems have seriously limited his ability to concentrate, understand, remember, follow instructions, complete tasks and handle stress and change. [Montgomery] alleges his physical and mental problems have combined to prevent him from working in any capacity.

(Id. at 3224–25.) The ALJ concluded that "[Montgomery]'s medically determinable impairments could reasonably be expected to cause his alleged symptoms. However, [Montgomery]'s statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record[.]" (Id. at PageID 3225.)

The ALJ considered Montgomery's medical records and his treatment history, as well as the opinions of several state agency medical consultants. The ALJ detailed Montgomery's complaints and the results of every doctor's visit he made regarding his physical and mental health during the relevant time period. (Id. at PageID 3225–33.) This included visits to the Jackson Clinic and the Wesley Neurology Clinic for his physical ailments, several consultative physical examinations with Drs. Peter Gardner and Aaron Davidson, routine appointments with the Quinco Community Mental Health Center, and a consultative psychological evaluation with Dr. Robert Kennon. (Id.)

Regarding his physical conditions, the ALJ noted that Montgomery "did not seek or receive any treatment . . . until almost a month after the date of his last unfavorable decision on August 22, 2018." (Id. at PageID 3225.) At each subsequent appointment, Montgomery detailed his current medical issues: seizures; pain in the shoulders, neck, back, legs, and ears; issues with his eyes; a coronavirus infection; and tremors. (Id. at PageID 3225–30.) The ALJ referenced the results of each visit, which frequently led to new diagnoses but consistently found that his physical condition was normal aside from his weight and BMI. (Id.) For most of his appointments, his medical records stated he was not in acute distress. (Id.) Regarding his

mental condition, the ALJ noted that Montgomery "did not seek or receive any treatment . . . until over two weeks after the date of his last unfavorable decision on August 19, 2018." (Id. at PageID 3230.) Aside from some issues stabilizing his medications, Montgomery's behaviors, appearance, and mental status evaluations were consistently normal. (Id. at PageID 3231–32.) The ALJ also made particular note of his diagnosis of malingering disorder. (Id. at PageID 3232.)

The ALJ summarized his first consultative physical examination, which Montgomery requested, on March 14, 2020, with Dr. Gardner, as follows:

> [Montgomery] advised him of his medical problems and treatment to date, and reported he was unable to work because of his severe seizures, fatigue and worsening respiratory and musculoskeletal problems. Dr. Gardner noted he was in no acute distress, but could only walk slowly due to his alleged shortness of breath and back pain. He examined [Montgomery] and noted his physical examination was normal except for some inspiratory wheezing in his lungs, unspecified tenderness and subjective complaints of pain in his lumbar spine on palpation, mildly to moderately limited movement in his hips, weight of 265 pounds and BMI of 39.1. Dr. Gardner diagnosed him with a psychogenic nonepileptic seizure disorder, chronic obstructive pulmonary disease with asthma and lumbar spine degenerative pain, and opined he was not even capable of performing the full range of sedentary work[.]

(Id. at PageID 3227.) The ALJ noted that two weeks later, on March 27, 2022, Montgomery

> underwent a telemedicine visit at the Wesley Clinic on March 27, 2020 and reported he was stressed, that his nerves were "shot", that he was still having some

> intermittent seizures and needed his medication for
> the same refilled. Nevertheless, [Montgomery] was
> noted to be fully alert, oriented and in no acute
> distress, and no abnormal objective medical findings
> were noted on his examination.

(Id. at PageID 3228.) The ALJ summarized his consultative
physical examination with Dr. Davidson, which the state agency
requested, on July 29, 2021, as follows:

> [Montgomery] advised him of his medical problems and
> treatment to date, and interestingly reported he had
> been having grand mal seizures every week for a while.
> [Montgomery] also reported he had a herniated disc and
> arthritis in his mid to low back that radiated down
> into his legs, and throbbing pain and swelling in his
> ankles that was aggravated by prolonged standing,
> walking and whether changes. [Montgomery] further
> reported he began having left shoulder problems four
> days earlier without any injury and that he was having
> an intermittent burning sensation. [Montgomery] did
> not mention, report or complain of any ear problems of
> any kind. Doctor Davison [sic] noted he was fully
> alert, oriented, cooperative and in no apparent
> distress, and that his physical examination was normal
> except for some unspecified tremors, mildly limited
> movement in his shoulders, decreased grip strength in
> his left hand due to his pain, mildly to moderately
> limited movement in his low back, weight of 260 pounds
> and BMI of 38.39. He diagnosed [Montgomery] with an
> epilepsy/conversion disorder, tremors, decreased range
> of motion in the areas outlined above and obesity, and
> opined he had no impairment related physical
> limitations, but was unable to drive because of his
> seizure disorder[.]

(Id. at PageID 3229.) The ALJ summarized his second consultative
physical examination with Dr. Gardner, which Montgomery again
requested, on August 17, 2022, as follows:

> [Montgomery] advised him of his medical problems and
> treatment to date, and again reported he was unable to
> work due to his seizures, fatigue, and worsening

respiratory and musculoskeletal problems. Doctor
Gardner noted he was in no acute distress, but that he
again walked slowly due to his alleged shortness of
breath and back pain. He also noted [Montgomery]'s
physical examination was normal except for some
inspiratory wheezing in his lungs, weight and BMI. Dr.
Gardner diagnosed [Montgomery] with a psychogenic
nonepileptic seizure disorder, chronic obstructive
pulmonary disease with asthma, and cervical, thoracic
and lumbar spine pain, and again opined he was not
even capable of performing the full range of sedentary
work[.]

(Id. at PageID 3230.) The ALJ noted that two weeks later, on

September 2, 2022, Montgomery "specifically denied having any

seizure, ear, respiratory or musculoskeletal problems of any

kind" during a routine visit to the Jackson clinic. (Id.)

On September 7, 2021, at a psychological appointment with

the Quinco Community Mental Health Center, Montgomery

advised his medication management specialist at Quinco
that he was taking his medications as instructed, that
he was stable on the same, and sleeping well at that
time. [Montgomery]'s appearance, mental status
examination and behavior were noted to be normal in
all regards, and he was advised to return three months
later for his next regularly scheduled appointment[.]

(Id. at PageID 3231.) Then, that same day, he underwent a

consultative psychological evaluation with Dr. Kennon at the

State agency's request. (Id.) Montgomery advised Dr. Kennon

of his mental problems and treatment to date, and
reported he was fretful, anxious, depressed and having
difficulty sleeping because of his physical problems.
Dr. Kennon interviewed him and noted his attention
span was fairly balanced, that he was oriented in all
spheres, pleasant, sociable, interacted well and was
appropriately dressed and well-groomed for the season.
He also noted [Montgomery] was responsive to his

questions, that his verbalizations were spontaneous, logical and clear, and behavior normal. However, Dr. Kennon did note that he was extremely preoccupied with his alleged physical problems, appeared relatively anxious, acted overwhelmed at times, that his mood was liable and sullen, and speech dramatic. He tested [Montgomery] and noted he was able to provide his Social Security number and address from memory, that he correctly identified the current and four other men who previously served as President, historical figures such as Martin Luther King, and the capitals of the United States and Tennessee. Doctor Kennon also noted he knew there were sixty seconds in a minute, twelve months in a year, and the purpose of a thermometer. He further noted [Montgomery] could spell the word "world" backwards and forwards correctly, find abstract similarities between paired objects, and interpret the meaning of simple proverbs. Dr. Kennon went on to note that he could count backwards from twenty without any errors, correctly perform simple addition and multiplication problems in his head, and complete his serial threes. However, he did note that [Montgomery] was unable to successfully complete his serial sevens. Dr. Kennon diagnosed him with a conversion disorder, and opined he was able to follow simple instructions and tasks, and complex detailed instructions. He also opined [Montgomery] was not limited in his ability to maintain persistence and pace on one and two step repetitive tasks, and only mildly limited in his ability to do so on complex ones. Dr. Kennon further opined he was only mildly limited in his ability to maintain adequate attention and concentration throughout the workday or work week, adapt to changes and handle stress or hazards in the workplace, but that he was moderately limited in his ability to withstand the stress of a routine workday. He finally opined [Montgomery] was not limited in his ability to interact with others[.]

(Id. at PageID 3231-32.) On February 14, 2022, Montgomery stated at a regularly scheduled psychological health appointment that

he was continuing to take his medications as instructed and was still stable. [Montgomery] also reported he was going to give his spouse a goodie bag with a variety of things for Valentine's Day, that he

- 10 -

was back playing drums with his band, and had found a
coin recently while metal detecting near his home.

(Id. at PageID 3232.)

Regarding Montgomery's physical and mental conditions, the

ALJ concluded:

> The evidence also reveals [Montgomery] can see, hear,
> understand, speak, read and write without any serious
> problems. He follows simple and low level detailed
> oral and written instructions fine, needs few
> reminders, little encouragement and usually finishes
> what he starts. [Montgomery] cares for all of his own
> personal needs without assistance and for some of
> daughter's and pet's. He prepares simple meals, cooks
> in his microwave oven, cleans, performs light
> household chores and does laundry. [Montgomery]
> navigates the internet and engages in online
> activities with his smartphone and/or computer, reads,
> watches television, plays video games, metal detects
> and exercises to some extent for pleasure. He lives
> with his wife and daughter and gets along well with
> them, other family members, friends, neighbors, people
> and authority figures fine for the most part, visits
> and spends time with some of them on a daily basis,
> and goes for rides, plays drums in a band and attends
> church with others on a regular basis. [Montgomery]
> manages all of his own personal finances without any
> help, goes out alone, knows how to drive, utilizes
> public transportation when necessary and shops.
> Therefore, the undersigned finds [Montgomery]'s
> activities of daily living are also inconsistent with
> his subjective allegations of disabling physical and
> mental problems, and are consistent with his residual
> functional capacity assessment outlined above as well.

(Id. at PageID 3233.) Regarding his work history, the ALJ opined

that Montgomery

> alleges he has been disabled and unable to work
> because of his physical and mental problems since the
> day after the date of his last unfavorable decision on
> July 24, 2018. However, nothing in the record
> indicates anything happened or occurred on or around

- 11 -

that date that prevented [Montgomery] from working at
that time as far as they were concerned, and the
evidence does not establish a medical reason for his
alleged inability to do so thereafter. Therefore, the
undersigned finds [Montgomery]'s work history is
inconsistent with his allegations of disabling
physical and mental problems[.]

(Id.)

The ALJ noted that "there are no medicals [sic] source
statements or opinions from any of [Montgomery]'s healthcare
providers in the record regarding his ability to function
physically or mentally." (Id. at PageID 3234.) He then
determined that

Dr. Gardner's opinion that [Montgomery] is not even
capable of performing the full range of sedentary work
is not persuasive or acceptable since it appears to be
based in large part on his subjective allegations as
opposed to his true abilities as thoroughly documented
in all of the other objective medical evidence in the
record previously outlined above, and because it is
not supported by and is inconsistent with the overall
weight of the evidence in the record as a whole. For
instance, Dr. Gardner assigned him very limited
lifting, carrying, postural, sitting, standing and
walking limitations on his last consultative physical
examination on August 17, 2022. However, he
specifically noted that [Montgomery] was not in any
acute distress that day, and that his examination was
essentially normal in all regards except for his
subjective complaints of fatigue and shortness of
breath on exertion, some unspecified inspiratory
wheezing in his lungs, tenderness and moderately
limited movement in spine on palpation and range of
motion testing, slow gait, weight and BMI.
[Montgomery] also interestingly did not report or
complain of any significant physical problems of any
kind, he specifically denied having any shortness of
breath, wheezing, coughing, spectrum production,
hemoptysis or dyspnea on exertion, and his physical
examination and gait were noted to be normal in all

> regards except for his subjective complaints of back
> pain on range of motion testing, weight and BMI when
> he returned to the Jackson Clinic for his regularly
> scheduled three-month checkup only two weeks later on
> September 2, 2022. The undersigned also notes
> [Montgomery]'s subjective reports and complaints to
> Dr. Gardner on his first consultative physical
> examination with him on March 14, 2020 were also
> inconsistent with those he gave to his medical
> providers both before and after the same as well, and
> that his physical examinations and gait were noted to
> be essentially normal in all regards on most of those
> occasions too. The undersigned further notes
> [Montgomery]'s activities of daily living, drumming
> and metal detecting hobbies are also inconsistent with
> Dr. Gardner's very stringent limitations and opinion
> that he would "likely" require a cane in the future.

(Id. at PageID 3234 (citations omitted).) He likewise found unpersuasive Dr. Davidson's opinion "that [Montgomery] has no limitations as far as his physical impairments are concerned other than his inability to drive" because "the overall weight of the objective medical evidence in the record establishes he does." (Id.) The ALJ then evaluated the remaining evaluators' opinions, including Drs. Umphlett, Vogelsang, Parrish, Adamolekun, Staab, and Sen, listing their persuasiveness and explaining his reasoning. (Id. at PageID 3235.) Finally, the ALJ opined that

> The opinion of Teresa Montgomery, [Montgomery]'s wife,
> is not persuasive or acceptable since she is not
> medically trained to make exact observations as to
> dates, frequencies, types and degrees of medical signs
> and symptoms, or of the frequency or intensity of
> unusual moods or mannerisms. The accuracy of her
> opinion is questionable moreover by virtue of her
> relationship to [Montgomery] since she cannot be
> considered a disinterested third party whose testimony

- 13 -

would not tend to be colored by her affection for
[Montgomery] and a natural tendency to agree with the
symptoms and limitations he alleges. More importantly
significant weight cannot be given to Ms. Montgomery's
opinion because it is simply not consistent with the
observations, statements and opinions of most of the
medical providers and physicians in this matter[.]

(Id.) The ALJ thus concluded that Montgomery's "residual
functional capacity assessment is supported by the overall
weight of the objective medical and opinion evidence in the
record, and his level of daily activity." (Id.)

At the fourth step, the ALJ determined that Montgomery was
"unable to perform any past relevant work." (Id. at PageID 3235–
36.) In making the finding, the ALJ relied on testimony from the
vocational expert ("VE"), who explained that Montgomery's former
work as an injection molding machine operator is physically
demanding such that he is no longer capable of doing this work
based on his RFC. (Id. at PageID 3236.) At the fifth step, the
ALJ concluded that, given Montgomery's "age, education, work
experience, and residual functional capacity, there are jobs
that exist in significant numbers in the national economy that
he can perform." (Id.) At the hearing, the VE testified that,
even given the limitations in his RFC, Montgomery could perform
the jobs "small parts assembler," "routing clerk," or "marker,"
each of which the VE testified represents at least 26,000 jobs
in the national economy. (Id. at PageID 3237.) The VE also
testified that based on the RFC evaluated by Dr. Gardner, there

would be no jobs in the national economy. (ECF No. 18-2 at
PageID 3817.) The ALJ found "that the vocational expert's
testimony is consistent with the information contained in the
[Dictionary of Occupational Titles]." (ECF No. 18-1 at PageID
3237.)) The ALJ concluded that, because there are jobs that
exist in significant numbers in the national economy that
Montgomery can perform, a "finding of 'not disabled' is
therefore appropriate . . . ." (Id.)

Montgomery now seeks judicial review of the ALJ's decision,
which stands as the final decision of the Commissioner under §
1631(c)(3) of the Act. On appeal, Montgomery argues that the ALJ
incorrectly decided his RFC, failing to adequately address Dr.
Gardner's evaluation of his condition.

## II. ANALYSIS

### A.   Standard of Review

Under 42 U.S.C. § 405(g), a claimant may obtain judicial
review of any final decision made by the Commissioner after a
hearing to which he or she was a party. "The court shall have
power to enter, upon the pleadings and transcript of the record,
a judgment affirming, modifying, or reversing the decision of
the Commissioner of Social Security, with or without remanding
the cause for a rehearing." 42 U.S.C. § 405(g). Judicial review
of the Commissioner's decision is limited to whether there is
substantial evidence to support the decision and whether the

Commissioner used the proper legal criteria in making the decision. Id.; Cardew v. Comm'r of Soc. Sec., 896 F.3d 742, 745 (6th Cir. 2018); Cole v. Astrue, 661 F.3d 931, 937 (6th Cir. 2011); Rogers v. Comm'r of Soc. Sec., 486 F.3d 234, 241 (6th Cir. 2007). Substantial evidence is more than a scintilla of evidence but less than a preponderance and is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Kirk v. Sec'y of Health & Human Servs., 667 F.2d 524, 535 (6th Cir. 1981) (quoting Richardson v. Perales, 402 U.S. 389 (1971)).

In determining whether substantial evidence exists, the reviewing court must examine the evidence in the record as a whole and "must 'take into account whatever in the record fairly detracts from its weight.'" Abbott v. Sullivan, 905 F.2d 918, 923 (6th Cir. 1990) (quoting Garner v. Heckler, 745 F.2d 383, 388 (6th Cir. 1984)). If substantial evidence is found to support the Commissioner's decision, however, the court must affirm that decision and "may not even inquire whether the record could support a decision the other way." Barker v. Shalala, 40 F.3d 789, 794 (6th Cir. 1994) (quoting Smith v. Sec'y of Health & Human Servs., 893 F.2d 106, 108 (6th Cir. 1989)). Similarly, the court may not try the case de novo, resolve conflicts in the evidence, or decide questions of credibility. Ulman v. Comm'r of Soc. Sec., 693 F.3d 709, 713

(6th Cir. 2012) (citing Bass v. McMahon, 499 F.3d 506, 509 (6th Cir. 2007)). Rather, the Commissioner, not the court, is charged with the duty to weigh the evidence, to make credibility determinations, and to resolve material conflicts in the testimony. Walters v. Comm'r of Soc. Sec., 127 F.3d 525, 528 (6th Cir. 1997); Crum v. Sullivan, 921 F.2d 642, 644 (6th Cir. 1990).

**B.   The Five-Step Analysis**

The Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1). Additionally, section 423(d)(2) of the Act states that:

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

- 17 -

Id. § 423(d)(2). Under the Act, the claimant bears the ultimate burden of establishing an entitlement to benefits. Oliver v. Comm'r of Soc. Sec., 415 F. App'x 681, 682 (6th Cir. 2011). The initial burden is on the claimant to prove she has a disability as defined by the Act. Siebert v. Comm'r of Soc. Sec., 105 F. App'x 744, 746 (6th Cir. 2004) (citing Walters, 127 F.3d at 529); see also Born v. Sec'y of Health & Human Servs., 923 F.2d 1168, 1173 (6th Cir. 1990). If the claimant is able to do so, the burden then shifts to the Commissioner to demonstrate the existence of available employment compatible with the claimant's disability and background. Born, 923 F.2d at 1173; see also Griffith v. Comm'r of Soc. Sec., 582 F. App'x 555, 559 (6th Cir. 2014).

Entitlement to social security benefits is determined by a five-step sequential analysis set forth in the Social Security Regulations. See 20 C.F.R. §§ 404.1520, 416.920. First, the claimant must not be engaged in substantial gainful activity. See 20 C.F.R. §§ 404.1520(b), 416.920(b). Second, a finding must be made that the claimant suffers from a severe impairment. 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(5)(ii). In the third step, the ALJ determines whether the impairment meets or equals the severity criteria set forth in the Listing of Impairments contained in the Social Security Regulations. See id. §§ 404.1520(d), 404.1525, 404.1526. If the impairment satisfies the

criteria for a listed impairment, the claimant is considered to be disabled. On the other hand, if the claimant's impairment does not meet or equal a listed impairment, the ALJ must undertake the fourth step in the analysis and determine whether the claimant has the RFC to return to any past relevant work. See id. §§ 404.1520(a)(4)(iv), 404.1520(e). If the ALJ determines that the claimant can return to past relevant work, then a finding of "not disabled" must be entered. Id. But if the ALJ finds the claimant unable to perform past relevant work, then at the fifth step the ALJ must determine whether the claimant can perform other work existing in significant numbers in the national economy. See id. §§ 404.1520(a)(4)(v), 404.1520(g)(1), 416.960(c)(1)-(2). Further review is not necessary if it is determined that an individual is not disabled at any point in this sequential analysis. Id. § 404.1520(a)(4).

## C. Montgomery's RFC

Montgomery argues that the ALJ's RFC finding violated the mandatory evidence evaluation criteria of 20 C.F.R. § 416.920c and 404.1520c. (ECF No. 23 at PageID 3838.) 20 C.F.R. § 416.920c states, in relevant part:

> (a) How we consider medical opinions and prior administrative medical findings. We will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from your medical sources. When a medical source provides one or more medical opinions or prior

administrative medical findings, we will consider
those medical opinions or prior administrative medical
findings from that medical source together using the
factors listed in paragraphs (c)(1) through (c)(5) of
this section, as appropriate. The most important
factors we consider when we evaluate the
persuasiveness of medical opinions and prior
administrative medical findings are supportability
(paragraph (c)(1) of this section) and consistency
(paragraph (c)(2) of this section). We will articulate
how we considered the medical opinions and prior
administrative medical findings in your claim
according to paragraph (b) of this section.

(b) How we articulate our consideration of medical
opinions and prior administrative medical findings. We
will articulate in our determination or decision how
persuasive we find all of the medical opinions and all
of the prior administrative medical findings in your
case record. Our articulation requirements are as
follows:

. . .

(2) Most important factors. The factors of
supportability (paragraph (c)(1) of this section) and
consistency (paragraph (c)(2) of this section) are the
most important factors we consider when we determine
how persuasive we find a medical source's medical
opinions or prior administrative medical findings to
be. Therefore, we will explain how we considered the
supportability and consistency factors for a medical
source's medical opinions or prior administrative
medical findings in your determination or decision. We
may, but are not required to, explain how we
considered the factors in paragraphs (c)(3) through
(c)(5) of this section, as appropriate, when we
articulate how we consider medical opinions and prior
administrative medical findings in your case record.

. . .

(c) Factors. We will consider the following factors
when we consider the medical opinion(s) and prior
administrative medical finding(s) in your case:

> (1) Supportability. The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be.
>
> (2) Consistency. The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be.
>
> . . .

20 C.F.R. § 416.920c. According to Montgomery, the ALJ failed to adequately address the issues of supportability and consistency in the final decision. (Id. at PageID 3842–44.) He argues that the

> ALJ failed to evaluate supportability in any meaningful way — that claimant was not in acute distress on examination was irrelevant to claimant's chronic spinal issues, for example, and irrelevant to plaintiff's daytime lethargy from his sleep apnea caused by his obesity. Likewise, comparing Dr. Gardner's evaluation with routine doctor visits for medication notes was neither informative nor helpful. Even less helpful to the process was the ALJ's finding that the plaintiff's playing his drums and doing sporadic metal detecting had some medical bearing, albeit unexplained.

(Id. at PageID 3842–43.) He then lists objective evidence the ALJ allegedly failed to rely upon, including MRI lumbar spine results from 2013 and 2018. (Id. at PageID 3843–44.) He further argues that Dr. Gardner's opinions were consistent with the

record because there are "voluminous treatment notes stretching back a decade[.]" (Id. at PageID 3844.)

The undersigned finds that the ALJ sufficiently explained his conclusion that Dr. Gardner's evaluations were only partially persuasive such that there was no violation of 20 C.F.R. § 416.920c. Dr. Gardner's opinions appear to be largely based on Montgomery's subjective claims made during the evaluation. Regarding supportability, Dr. Gardner identified no acute distress during his evaluations, noting Montgomery "could only walk slowly due to his alleged shortness of breath and back pain." (ECF No. 18-1 at PageID 3227, 3234) Dr. Gardner nonetheless reported that Montgomery is limited to the most restrictive possible range of activity. (Id. at PageID 3227, 3230.) The ALJ further explained that Dr. Gardner's findings were inconsistent with evaluations by his other doctors, including at a visit several weeks after his first evaluation with Dr. Gardner. (Id. at PageID 3228, 3234.) His regular physician found that he continued to show no acute distress but appeared to have a normal gait and aside from "low back pain with motion" was otherwise in normal condition. (Id. at PageID 3228, 3732.) In all, the ALJ pointed to ten separate doctors' visits during the time period in which Montgomery's condition was "essentially normal in all regards[.]" (Id. at PageID 3234.) The ALJ was well within reason to observe that Dr. Gardner's

evaluation of Montgomery's RFC was inconsistent and unsupported by Montgomery's daily activities, which included metal detecting and drumming in a band. Id. See, e.g., Rottmann v. Comm'r of Soc. Sec., No. 19-2205, 2020 WL 3397744, at *3 (6th Cir. June 19, 2020) ("We therefore agree with the district court that the inconsistencies between Rottmann's self-reported activities and the treating physicians' medical reports provide substantial evidence to support the ALJ's findings."). Separately, Montgomery's argument that the MRI evidence was "ignored" is not supported by the record because the ALJ addressed the 2018 MRI results in detail. (ECF No. 18-1 at PageID 3226.)

There is substantial evidence before the court, as there was before the ALJ, to reach the conclusion that Montgomery is capable of the limited range of light work detailed by the ALJ.

### III. CONCLUSION

For the reasons above, the decision of the Commissioner is AFFIRMED.

IT IS SO ORDERED.

s/Tu M. Pham
TU M. PHAM
Chief United States Magistrate Judge

July 11, 2023
Date